THE AUSTRIA.    (Two Cases.)

*(District Court, D. California.   January 31, 1882.)*

1. ADMIRALTY—INJURY AT PIER—INEVITABLE ACCIDENT.
   Inevitable accident is where a vessel is pursuing a lawful avocation in a lawful manner, using proper precautions against danger, and an accident occurs. It is enough that the caution exercised should be reasonable under the circumstances; such as is usual in similar cases, and which has been found sufficient, by long experience, to answer the end in view—the safety of life and property. The highest degree of caution that can be used is not required.

2. SAME—CASE STATED.
   Where a vessel,—made fast to a wharf by a competent band of stevedores by fasts which, through long experience, are deemed by them sufficient,—through the action of the winds and waves, breaks her fastenings and drifts towards a schooner, placing the schooner in such imminent peril that in moving to a place of safety she is capsized and founders, it is a case of inevitable accident.

*M. Andros,* for libelants.

*W. H. L. Barnes,* for claimants.

HOFFMAN, D. J.   On the eighth of March, 1881, the ship Austria and the scow-schooner Modoc were lying at a pier on the north side of a slip in Oakland Long Wharf.   The Modoc arrived at about 12 or 1 o'clock, and made fast to the wharf astern of the Austria—the latter being further up the wharf, towards its head.   At about 4 o'clock P. M. the Modoc moved further up the slip to a position south and abreast of the Austria, with the object of getting under her lee, as the weather had become threatening.   She put out several lines to the wharf forward and astern of the Austria, and attached one to the latter vessel about amidships.   The wind continued, as night came on, to increase in violence, and at about 8 o'clock the Modoc was hailed from the Austria to let go the line attached to that vessel.   Before, however, this could be done, the line was cast off by the Austria's crew.   The Modoc then hauled off to the south side of the slip to a position to the south of and not far from abreast of the Austria.

A short time afterwards the schooner was hailed from the Austria to get away, as the latter was drifting.   She had in fact parted her forward fasts, and her bow was beginning to swing round towards the south before the northerly gale.   There seemed to be imminent danger that the schooner would be crushed between the Austria and the wharf.   She therefore commenced hauling out between the Austria's stern and the stern of the Transit, a large steamer which was attached to the southerly pier of the slip.   In so doing her boat was crushed, but whether by contact with the Austria, or by the falling

of the schooner's main boom, the topping-lift of which had fouled with the rigging of the Transit, is disputed. The Modoc continued to haul over towards the southerly pier, which she finally reached, but foundered almost immediately on coming in contact with it. The Austria's bows, in the mean time, had continued to swing around until they were checked by her bowsprit coming in contact with the railroad company's sheds on the southerly pier. As her stern lines still held, this brought her up, and she remained in the same position during the rest of the night.

It is claimed by the libelants that the accident was the indirect but not remote consequence of the Austria's negligence in breaking adrift.

1. The claimants contend that the breaking adrift was the result of inevitable accident; and,

2. That even if the Austria was guilty of negligence, the foundering of the schooner was the direct consequence of her being overladen and unseaworthy; that her deck-load had become saturated with water, rendering her crank and top-heavy, and giving her a list to starboard, which constantly increased until she capsized in the heavy sea which was setting in under the piles of the wharf; and that, as there was no actual collision of the vessels, the foundering of the Modoc was too remote a consequence of any negligence of which the Austria might have been guilty, to render her liable.

The circumstances of this case suggest several interesting questions, which, however, in the view I take of it, do not require a definitive solution.

In general, it would seem that where a vessel, herself free from fault, has been obliged by the fault of another to change her position, or attempt any other maneuver, to avoid impending danger, and in doing so sustains an injury, the damage should be deemed to have been caused by the vessel by whose fault she was compelled to incur the risks of making the maneuver. But in this, as in cases of apprehended collision, she is bound to exercise reasonable judgment and skill, in the absence of which the damages will be apportioned. 7 Wall. 203. But suppose the new position which she is obliged to take is more perilous than her original one, and that before she can move to a safer position a storm arises, the consequences of which she would have escaped in her old position. Is the offending vessel, which originally compelled her to shift her position, liable for the damage done by the storm?

Again: A vessel threatened with injury through the fault of another is, as already remarked, bound to exercise reasonable skill and

diligence to avoid or mitigate its consequences. Is she not also bound to be well conditioned and appointed, with all necessary appliances to avoid a collision, even though the danger of its occurrence may have arisen from the fault of another?

Suppose, for example, that in attempting to escape from an impending collision, a vessel, by reason of defective steering apparatus or rigging, sustains damage which she would have escaped had she been sufficiently provided. Or suppose that, being compelled to slip her anchor, she might readily have secured her safety had she been provided with proper lines and hawsers, but owing to the entire absence of these she is stranded. Or suppose that she is overladen and unmanageable, and from that cause unable to execute a maneuver which she might otherwise have safely accomplished.

It would seem, in these and similar cases, that where a vessel is endangered by the fault of another, and unable to secure her safety through the want of the usual and proper appliances and means, she is herself as much in fault as if her inability arose from the want of proper skill and diligence on the part of her officers and crew.

But if her inability has been the result of a peril of the sea or *vis major*, the consequences of which she has been unable to remedy, then her defective means should not be imputed to her as a fault.

It is unnecessary to pursue this subject further. Perhaps what has already been said is superfluous, as it is certainly *obiter*. In my judgment, the accident in this case is not to be attributed to the negligence of the Austria, but to "inevitable accident." Numerous authorities, defining the meaning of this term and illustrating its application, have been cited at the bar.

It will be sufficient to quote the language of the supreme court in a single case. "Inevitable accident," says the court, "is where a vessel is pursuing a lawful avocation in a lawful manner, using the proper precautions against danger, and an accident occurs. *The highest degree of caution that can be used, is not required. It is enough that it is reasonable under the circumstances; such as is usual in similar cases, and has been found, by long experience, to be sufficient to answer the end in view—the safety of life and property.*" *The Grace Girdler*, 7 Wall. 203.

The Austria was made fast to the wharf by a gang of stevedores, under the direction of Capt. Batchelder, a master stevedore of 30 years' standing, assisted by two foremen of great experience. It is unnecessary to enumerate the various chains and hawsers by which she was attached to the wharf. In the judgment of all concerned in

the operation, they were sufficient to secure her safety under all circumstances likely or possible to occur. Two witnesses, and those of no very great experience, suggest that it would have been better to put out her anchor chain. But this criticism is made after the event, and one of them, when informed what fasts were actually put out, admitted that "he thought them sufficient, except in *some great emergency*."

Capt. Batchelder declares that even with his experience of the result, he would not moor the vessel differently if the work had to be done over again. He expresses the opinion that if he had put out the anchor chain, it would either have parted or torn out the pile to which it was attached. If the mooring had been insufficient, it would have been easy to establish the fact by the testimony of experts. No stevedore of experience has been called to express such an opinion.

I think, therefore, that the measures adopted by the Austria were, in the language of the supreme court, "reasonable under the circumstances; such as are usual in similar cases, and have been found, by long experience, to be sufficient to answer the end in view

It is contended on the part of the libelants that the Austria was negligent in not putting out other fasts after the first one had parted. The interval that occurred between the time when her fasts began to part and her bringing up against the shed was from 20 to 25 minutes. No expert has been called to state what the persons on board (three in number) could have done, more than they actually did, to prevent the vessel from breaking adrift. They were certainly busy paying out chain, etc., and doing what seemed best to them for the safety of the ship. It is not shown that three men were not the usual and proper crew or watch for a vessel lying in a slip and supposed to be securely fastened to a wharf.

But the conclusive answer to the suggestion is that the negligence suggested did not and could not have had any effect to avert the disaster.

The schooner was warned to move away when the danger of the ship's breaking adrift became apparent. The latter was in fact brought up by the sheds on the opposite wharf without touching the schooner, though possibly she may have crushed the boat at her stern.

The accident occurred during the attempt of the schooner to get out of the way of the vessel, which she was warned was drifting down on her. That attempt she made as soon as she was apprised of her danger. If, then, the men on board the ship had succeeded in preventing her bows from breaking adrift, the result would have been in

no respect different. She did bring up against the shed, without touching the schooner.

The latter foundered in the attempt to extricate herself from a position of imminent danger. That attempt she had already entered upon, and the result would have been the same if additional fasts sufficient to secure the ship had been put out, and her further drift ing thereby arrested, just as it was a very short time afterwards by her coming in contact with the sheds.

The negligence, if any, to be imputed to the Austria, is negligence in the original mooring; and of this, for the reasons assigned, I do not find her guilty.

Libels dismissed.